IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 15, 2015

**STATE OF TENNESSEE v. DANNY WAYNE HORN**

**Appeal from the Criminal Court for Johnson County**
**No. 2013-CR-181     Stacy L. Street, Judge**

_____

**No. E2015-00715-CCA-R3-CD – Filed February 12, 2016**

_____

The Defendant, Danny Wayne Horn, was convicted by a jury of aggravated sexual battery, a Class B felony. <u>See</u> Tenn. Code Ann. § 39-13-504. He received a sentence of ten years' incarceration for said conviction. The Defendant now appeals, arguing that the evidence presented was insufficient to support his conviction; that the trial court erred in denying his request for a mistrial after the victim stated that she identified the Defendant from "his picture on a sex offender website"; and that the State committed plain error during closing argument by alluding to the Defendant's status as a registered sex offender. Following our review, we discern no reversible error and affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Steve McEwen, Mountain City, Tennessee (on appeal); Jeffery C. Kelly, District Public Defender; and Melanie Sellers, Assistant District Public Defender (at trial), for the appellant, Danny Wayne Horn.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Anthony Wade Clark, District Attorney General; and Matthew Edward Roark, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
<u>FACTUAL BACKGROUND</u>

The Defendant was charged in a December 2, 2013 presentment with aggravated sexual battery of the victim, H.S.,[1] a child less than thirteen years of age, occurring on or about a day between May and August 2008. Thereafter, the Defendant filed a motion in limine to exclude any reference to a prior November 30, 1994 conviction of his for attempted aggravated sexual battery and to his status as a registered sex offender. The trial court granted the Defendant's motion. Defense counsel also requested that the State be instructed to inform its witnesses of the trial court's ruling, and the trial court so ordered. The case proceeded to a trial by jury in November 2014.

At the Defendant's trial, the State's proof showed that the victim's father lived in Shady Valley, Tennessee, during the summer of 2008 and that the victim visited her father on weekends. The victim turned eight years old at the end of August 2008. According to the victim, at some point in the summer, her cousin and his girlfriend came to visit at her father's house, and the Defendant accompanied them. The three stayed for the weekend in order to attend drag races. The victim's older brother was also present in the house.

The victim testified that, while the Defendant was there, he touched her "[i]n [her] private parts down there." The victim further detailed that they were in the living room when the Defendant fondled her vagina; that it occurred "in the afternoon, like mid-day" on a Saturday; and that they were alone inside the house while the others were outside grilling. According to the victim, the Defendant instructed her "not to tell anybody[,]" and being scared, she kept silent.

Although the victim had expressed her dislike of the Defendant to her aunt, S.B., it was not until the victim was in sixth grade that she finally reported the sexual abuse. The victim explained why she felt inclined to do so at that time:

> I was at school and it—like memories just started like flooding back and it was just like putting me down and stuff[;] and one of my teachers noticed that I had been feeling like[—]she could tell something was wrong with me[;] and she pulled me to the side one day and told me that the same thing happened to her. And, so, I figured if she can trust me then I can trust her.

On cross-examination, the victim acknowledged that, when speaking with her teacher, she said that the perpetrator's name was Larry and that the act occurred in Virginia while on a camping trip. About a month later, the victim was interviewed by

---

[1] It is the policy of this court to refer to minors, as well as victims of sexual offenses, by their initials. We will additionally refer to the victim's relatives by their initials in furtherance of our efforts to protect the victim's identity.

Amy Bachman at the Children's Advocacy Center in Sullivan County, and she identified her offender as a man named Steve. The victim only pinpointed the Defendant when she looked at pictures "online . . . on a sex offender website" under her own volition. The victim further admitted that she never mentioned the drag races when speaking with either her teacher or Ms. Bachman.

She clarified on redirect examination that she was not sure what her assailant's name was at the time she made those statements—that "[i]t was just like a familiar name" of "an old guy[.]" She then unequivocally labeled the Defendant as the man that fondled her vagina.

The victim's father, D.S., verified that the Defendant was a visitor in his house during the summer 2008, spending both a Friday and Saturday night there, while the victim was present. D.S. had previously met the Defendant while visiting his cousin in Cookeville, and he said that he knew the Defendant "pretty well."

D.S. depicted the events of the weekend surrounding the victim's allegations of sexual abuse:

> I invited them up for drag strips. Me and my son we met them at the drag strip on Friday night. We enjoyed the drags, come [sic] home, spent the night in Shady Valley. We got up and left and went to my sister's Saturday, then went and seen [sic] my dad. We come [sic] back. We cooked out. We all went to sleep, and we got up Sunday morning then they left.

D.S. confirmed that the victim never told him about the sexual abuse by the Defendant and that he only learned of the incident five years later, after the victim told her teacher. According D.S., he had never had any disciplinary problems with the victim, and she always told the truth.

On cross-examination, D.S. confirmed that he was interviewed by Investigator Shawn Brown of the Johnson County Sheriff's Department about the victim's allegations. D.S. agreed that he never mentioned the drag races to Inv. Brown, instead saying that the group came to visit that weekend due to "something about breeding some dogs[.]" D.S. also assented to taking many camping trips with his daughter accompanied by a "pretty large number of people." According to D.S. on redirect examination, he never told the victim to name the Defendant; the victim only identified the Defendant when "they went to the private investigator in Sullivan County"; and prior to that time, "[n]obody knowed [sic] nothing about this."

S.B., the victim's aunt, testified that she and the victim were very close—that the victim was "like [her] daughter." S.B. verified that her cousin, his girlfriend, and the Defendant came to visit her brother in the summer of 2008 and that the group went to the drag races and then came to S.B.'s house on Saturday for a visit. S.B., who worked in the mental health field, said that the victim's behavior changed around this time: "She become [sic] more reserved, not so outgoing, and she . . . just seemed angry." When S.B. would ask the victim if something was wrong, the victim would respond by saying "nothing." According to S.B., one night "out of the blue," the victim said to her, "I hate Danny." S.B. clarified with the victim which Danny she was referring to, and the victim identified the Defendant. The victim, however, would not give any reason for her dislike to S.B. This conversation first occurred about three months after her cousin and the Defendant came to visit for the weekend, according to S.B.

On cross-examination, S.B. described the victim as usually "a very polite and . . . respectful young lady." S.B. also agreed that she never voiced any concerns about the victim's statements to the victim's father. On redirect examination, S.B. clarified that she did not say anything to anyone about the victim's demeanor change because she thought the victim's disdain for the Defendant was likely due to his "foul mouth."

As its final witness, the State called Inv. Brown. Inv. Brown said that he received a call from the victim's mother on August 21, 2013, during which she reported the victim's allegations of sexual abuse at the hands of the Defendant. After this phone call, Inv. Brown opened an investigation upon learning that the crime occurred in Johnson County, where the victim's father's residence was located. Inv. Brown contacted several other agencies in Sullivan County and ultimately received a "child referral" or "PCS intact [sic] form" from James Miller, an investigator with the Department of Children's Services ("DCS"). Inv. Brown stated that he also spoke with the victim's father by phone but confirmed that he did not interview the victim, believing that, "during these particular types of investigation[s] it's better to let those people who are trained to deal with individual children to do those interviews." According to Inv. Brown, DCS had already interviewed the victim.

Based upon conversations with Inv. Miller, Inv. Brown was able "to identify a potential suspect" in the case, the Defendant. Thereafter, on the morning of November 21, 2013, Inv. Brown went to the Defendant's residence in Cookeville to speak with him. Inv. Brown, once inside the Defendant's home, advised the Defendant that he was there to discuss the victim's allegations, and the Defendant gave a confession. Inv. Brown wrote the confession, which was signed by Inv. Brown, the Defendant, the Defendant's mother, and another male that was present. The Defendant provided Inv. Brown with the following details:

-4-

I was with [the victim's cousin and the cousin's girlfriend]. We left Cookeville on Friday going to Bristol to the drag races. We met [D.S.] at the drag races. We watched the races [un]til it was over with. I don't know what time, it was dark. When we left the races we went to [D.S.'s] sister's house. . . . We all sat around, drank coffee. We was [sic] there for 4 or 5 hours. I think this was after midnight. . . . We all hung out in the living room and played cards. After a while everything wore down we left. . . . We went to [D.S.'s] house. We went to bed. I think it was Saturday morning. We got up around 8 or 9, ate breakfast. We hung out at [D.S.'s] house for a while. We left there, went back to [D.S.'s] sister's where everybody else was. [The victim] was there. We all got together and went to App[alachian] Trail head. We just hung out and walked around. We went back to [D.S.'s] house. . . . Saturday night come [sic] everybody was all there. We all slept there. I slept in the same room with [D.S.'s] son. We got up about 10:00 maybe. [The victim] was sitting on the chair watching TV, eating cereal. That's when I went over, and fondled her . . . . She had her legs crossed. I touched her v[aginal] area with my left hand fingers. This was fast because her brother was laying [sic] on the couch asleep. I think [the victim] was 8 or 9 at the time.

The Defendant also initialed the statement in several places.

On cross-examination, Inv. Brown verified that he did not have video recording of the victim's interview at the Children's Advocacy Center with Ms. Bachman and that he was only provided a "one-paragraph" summary of that interview. Regarding inconsistencies in the victim's statements, Inv. Brown agreed that that the victim did not name the Defendant in the statement to Ms. Bachman and that she stated that the group arrived late one evening and left early the next morning. Inv. Brown also recalled that the DCS referral he received from Inv. Miller named the perpetrator as "Larry," stated that the offense occurred in Virginia, and contained a statement that the victim had previously told her father and aunt of the sexual abuse.

When asked about his phone conversations with the victim's father, Inv. Brown confirmed that D.S. did not remember "anything happening of any note whatsoever regarding that weekend" the Defendant was at his home; that D.S. did not mention drag racing but instead said they were there to breed dogs; and that D.S. never said that his daughter seemed upset or scared. Inv. Brown acknowledged that he did not conduct any additional interviews with the victim, the victim's father, the victim's mother, the victim's aunt, the victim's cousin or the cousin's girlfriend, or the victim's teacher. According to Inv. Brown, he did not need to interview these individuals because the suspect had already been identified and that suspect then confessed.

-5-

Regarding the Defendant's confession, Inv. Brown agreed that the Defendant did not read or write well and that was one of the reasons he wrote the Defendant's statement for him. Inv. Brown said that it was possible that he told the Defendant he wanted to help him if the Defendant was honest with him.

Based on this evidence, the jury convicted the Defendant as charged. Thereafter, the trial court sentenced the Defendant as a standard offender to a term of ten years' incarceration, which was to be served at one hundred percent by operation of law. This timely appeal followed.

ANALYSIS

On appeal, the Defendant takes exception to the sufficiency of the convicting evidence; to the trial court's denial of his motion for a mistrial after the victim stated that she identified the Defendant from "his picture on a sex offender website"; and to the prosecutor's statement during closing argument alluding to the Defendant's status as a registered sex offender. We address each in turn.

*I. Sufficiency*

The Defendant argues that the evidence is insufficient to support his conviction for aggravated sexual battery, citing the victim's questionable credibility due to her various inconsistent statements, and that there was no proof that the touching was for sexual arousal or gratification. The State replies that there was ample direct and circumstantial evidence for the jury to determine that the Defendant committed this crime.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial

evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As charged in the indictment, aggravated sexual battery is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [and][t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4). "Sexual contact" is defined as "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Tenn. Code Ann. § 39-13-501(6). "'Intimate parts' includes the primary genital area, groin, inner thighs, buttock or breast of a human being." Tenn. Code Ann. § 39-13-501(2).

At trial, H.S. testified that the Defendant, along with H.S.'s cousin and his girlfriend, visited her father's residence one weekend during the summer of 2008 to attend some drag races. While she was alone with the Defendant in the living room that Saturday, the Defendant touched her vaginal area. Additionally, the Defendant provided Inv. Brown with a similar account of events. Such testimony was sufficient to allow a rational juror to conclude that the Defendant had touched the clothing covering H.S.'s "primary genital area, groin, inner thighs, [or] buttock[.]" The record clearly establishes that H.S. was under the age of thirteen at the time of the incident. Furthermore, according to H.S., the Defendant instructed H.S. not to tell anyone about what happened. A rational juror could conclude that the Defendant touched H.S. for the purpose of sexual arousal or gratification. Finally, the Defendant cross-examined the victim and the other witnesses at length about the inconsistencies in H.S.'s various statements. Despite hearing this testimony, the jury accredited H.S.'s account of events, and we will not disturb their credibility determination on appeal. See Cabbage, 571 S.W.2d at 835. Accordingly, we conclude that the evidence was sufficient to support the Defendant's conviction for aggravated sexual battery. See, e.g., State v. Scott L. Bishop, No. W2014-01540-CCA-R3-CD, 2015 WL 6859780, at *9 (Tenn. Crim. App. Nov. 6, 2015) (concluding same under similar facts with similar arguments presented on appeal).

## II. Mistrial

The Defendant next challenges the statement made by the victim's referencing the Defendant's status as a registered sex offender. Pretrial, the trial court granted the Defendant's motion in limine excluding any mention of the Defendant's status as a registered sex offender and also, pursuant to the Defendant's request, instructed the State to inform its witnesses thusly. However, despite this pretrial ruling, the following exchange took place on cross-examination of the victim: "Q. Now, sometime after this interview with Ms. Bachman do you remember being shown a picture?" "A. No. But, I did go online and look at his picture on a sex offender website."

The Defendant requested a hearing out of the jury's presence and moved for a mistrial. The prosecutor asserted that he had informed the victim pretrial not to make any reference to the Defendant's status as a sexual offender or of his having any type of prior conviction. Although agreeing that the victim's testimony was directly contrary to the motion in limine ruling, the trial court declined the Defendant's request for a mistrial. As a remedy for this improper reference, the trial court stated that no curative instruction would be given but that the jury would be specifically instructed instead to "disregard the last question and answer." Defense counsel then stated that, if no mistrial was to be granted, she preferred to cross-examine the victim about her answer. In light of defense counsel's desire, the trial court decided to give a curative instruction at the conclusion of the victim's cross-examination on how the evidence was to be considered.

The victim then testified that she did not identify the Defendant until she found this picture online and saw that the Defendant "had some sort of issue in his past[.]" She further agreed that she was never shown a picture by Ms. Bachman or Inv. Brown and that she was never asked about her prior misidentifications. At the conclusion of cross-examination, the trial court instructed the jury as follows:

> Ladies and Gentlemen, you've heard some testimony about something in the [D]efendant's past. You understand that what you're being asked to decide today is based upon the conduct that is—that you will hear evidence about not something in the past. . . . You're to determine the facts of what was alleged to have happened in the presentment and base your decision upon this, not the past of either party.

The Defendant made no objection to the curative instruction as given.

Following the Defendant's motion for judgment of acquittal, the trial court gave a detailed response for its decision to deny a mistrial:

-8-

No doubt that an inappropriate comment was made. In . . . looking at this it must be clear that the court consider these factors, and I want to make sure it's in the record that I have, whether or not the [S]tate elicited the testimony, or whether it was un-solicited and unresponsive. In this case it was not solicited by the [S]tate, nor was it solicited by the [D]efendant. It was . . . a response, quite a[n] un-responsive response, to a question asked by the defense by a witness that should have been instructed not to. But, it was not something deliberately elicited by either side. And the court would not[e] it was from a 14-year-old witness. Two, whether or not the trial court offered, or gave a curative instruction, both of those happened in this case. And I think it was handled appropriate[ly] by [defense counsel] in asking the questions the way she did and it didn't highlight the problem . . . with what was said . . . . And, number three, the relative strength or weakness of the [S]tate's case . . . . [G]iven the statement by the [D]efendant the court finds that its—its decision to deny . . . the mistrial was appropriate now considering the relative strength of the [S]tate's case. . . . I think based upon those factors that motion for a mistrial was correctly denied at that time understanding—noting your objection to that, okay.

The Defendant contends on appeal that it was error for the trial court to fail to grant a mistrial following the victim's reference to his status as a registered sex offender in violation of the trial court's order in limine excluding all reference to the Defendant's prior sexual offense and status. The Defendant further submits that the curative instruction was insufficient to remedy this egregious error.

A mistrial should be declared only if there is a manifest necessity for such action. Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981). The burden of establishing a "manifest necessity" lies with the party seeking the mistrial. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). When determining whether a "manifest necessity" exists, "no abstract formula should be mechanically applied and all circumstances should be taken into account." State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993) (quoting Jones v. State, 403 S.W.2d 750, 753 (Tenn. 1966)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." Williams, 929 S.W.2d at 388. A trial court's decision regarding whether to grant a mistrial will only be overturned upon a showing of an abuse of discretion. Id.

Although Tennessee courts do not apply "any exacting standard" for determining when a mistrial is necessary after a witness has injected improper testimony, this court

has suggested that the following criteria be examined when a witness has made an improper comment: "(1) whether the improper testimony resulted from questioning by the [S]tate, rather than having been a gratuitous declaration, (2) the relative strength or weakness of the [S]tate's proof, and (3) whether the trial court promptly gave a curative instruction." State v. Demetrius Holmes, No. E2000-02263-CCA-R3-CD, 2001 WL 1538517, at *4 (Tenn. Crim. App. Nov. 30, 2001) (footnote omitted); see also State v. Bernie Nelson Thomas, Jr., No. W2004-00498-CCA-R3-CD, 2004 WL 2439405, at *5 (Tenn. Crim. App. Nov. 1, 2004) (concluding that the trial court did not err when it failed to declare a mistrial when one witness referred to a "previous sale" with the defendant, who was on trial for selling crack cocaine). In the present case, all three factors are pertinent.

First, the improper testimony was on cross-examination, rather than direct questioning from the State. The challenged remark was an unsolicited, spontaneous remark by the fourteen-year-old victim. Moreover, the trial court gave a curative instruction at the conclusion of the victim's cross-examination, the language of which defense counsel had no objection to. Above all, the record shows that the State presented relatively strong proof, which included the Defendant's confession providing similar details as the victim's recounting.[2] Based upon the facts of this case and our review of the record, we conclude that the trial court did not abuse its discretion in denying the motion for a mistrial. See, e.g., State v. Larry Sigmon Reese, No. E2007-02905-CCA-R3-CD, 2009 WL 1110547, at *5 (Tenn. Crim. App. Apr. 24, 2009) (concluding no error by the trial court's refusal to grant a mistrial following a witness's testimony that the defendant had previously assaulted the victim because the victim clearly identified the defendant as her attacker and the defendant confessed); State v. Terry Wayne Luna, No. M2001-02752-CCA-R3-CD, 2003 WL 535928, at *2 (Tenn. Crim. App. Feb. 26, 2003) (holding no abuse of discretion for failure to grant a mistrial under similar factual scenario—the testimony complained of resulted from a question asked by defense counsel, the proof presented by the State to support aggravated sexual battery offense was relatively strong, and the trial court promptly gave a curative instruction).

---

[2] We feel constrained to note the importance of this factor in our determination. The State offered marginal proof of the victim's identification of the Defendant on direct examination. Although the inadmissible statement was made on cross-examination, the State would have known, and should have known through reasonable investigation, how its victim ultimately recognized the Defendant as her abuser; consequently, the State could have certainly developed the identification evidence better on direct and avoided the problem altogether. There is no indication in the record that defense counsel was even aware that her question would solicit such an answer. Considering the manner of identification and the many contradictions in the victim's testimony, this issue would, in all likelihood, result in a reversal were it not for the Defendant's confession. Otherwise, what is the point in a court ruling on a motion in limine if the State's witness can ignore the court's ruling and the error is routinely declared harmless?

### III. Closing Argument

As his final issue, the Defendant argues that the prosecution committed plain error in its closing argument by referencing how the victim identified the Defendant's picture on a sex offender website. The State responds that the Defendant has failed to establish plain error in the State's closing argument.

During closing arguments, the prosecutor said the following:

> Now, going back to [the victim's] statement, whether or not her father knew, or her aunt knew, what you've been provided about her previous statements is very ambiguous. But, what's unambiguous is that she was sexually assaulted. And, also, looking at the fact that she was 8 years old when this happened, and then four years later she can't remember exactly what his name is. She told you on the stand that she may not have called him by the right name to begin with, but she was thinking about this man. So, the [S]tate would argue that whether she called him Steve, or Larry, or somebody else is really irrelevant. She knew who she was talking about. She was talking about [the Defendant]. <u>And how she figured out who he was it just reinforced that it was this man right here.</u>

(Emphasis added). The Defendant submits that "this conduct was highly prejudicial and egregious, especially considering that the court specifically excluded such evidence[,]" and that "[t]he comment essentially constituted argument to the jury that the [Defendant] must be guilty since he was a registered sex offender." The State asserts that, to the contrary, "[t]he context of the prosecutor's comments indicates that the prosecutor intended to impress upon the jury that the victim was confident that the [D]efendant was the person who committed the crime and not that the [D]efendant should be convicted because he ha[d] a history of bad acts." The State further notes that the case against the Defendant was "strong[,]" including the Defendant's "admission and the victim's testimony that the [D]efendant fondled her."

The Defendant acknowledges that he failed to raise a contemporaneous objection at trial to this comment and only raised this issue for the first time in his motion for new trial. Thus, his issue is only reviewable pursuant the plain error doctrine. <u>See</u> Tenn. R. App. P. 36(b); <u>State v. Thomas</u>, 158 S.W.3d 361, 413 (Tenn. 2005) (appendix) (where a prosecuting attorney makes allegedly objectionable remarks during closing argument, but no contemporaneous objection is made, the complaining defendant is not entitled to relief on appeal unless the remarks constitute "plain error"). In order for this court to find plain error in the absence of an objection at trial, we consider the following five factors:

(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice.

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). Plain error cannot be found unless the record establishes all of the elements of the Adkisson standard. Id. at 283. In order for this court to reverse the judgment of the trial court, we must conclude that the error involved a substantial right and "more probably than not affected the judgment . . . ." Tenn. R. App. P. 36(b); State v. Yoreck, 133 S.W.3d 606, 611 (Tenn. 2004).

Our supreme court has consistently opined on prosecutorial misconduct regarding closing arguments as follows:

> The basic purpose of closing argument is to clarify the issues that must be resolved in a case. State v. Banks, 271 S.W.3d 90, 130 (Tenn. 2008). While "argument of counsel is a valuable privilege that should not be unduly restricted," Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975), "such [] arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995); see also State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). Because closing argument affords an opportunity to persuade the jury, 11 David L. Raybin, Tennessee Practice: Criminal Practice and Procedure § 29 .2, at 97 (2008), leeway should be given regarding the style and substance of the argument. Banks, 271 S.W.3d at 131; State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998). Hence, counsel may employ "forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence." Banks, 271 S.W.3d at 131.

State v. Sexton, 368 S.W.3d 371, 418-19 (Tenn. 2012).

The court has also advised that a criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument. Banks, 271 S.W.3d at 131 (citing United States v. Young, 470 U.S. 1, 11-13 (1985); State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal)). "An improper closing argument will not

constitute reversible error unless it is so inflammatory or improper that i[t] affected the outcome of the trial to the defendant's prejudice." Id. (citing State v. Thacker, 164 S.W.3d 208, 244 (Tenn. 2005) (appendix); State v. Cribbs, 967 S.W.2d 773, 786 (Tenn. 1998)); see also State v. Reid, 164 S.W.3d 286, 321 (Tenn. 2005). This court has adopted a five-part test to measure the prejudicial impact of improper prosecutorial misconduct, which requires appellate court's to examine the following factors: (1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecutor; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. See Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also Goltz, 111 S.W.3d at 5-6.

The Defendant did raise the issue at the motion for new trial hearing, and the trial court found that no prosecutorial misconduct occurred, reasoning as follows:

> I must trust that the jury followed what was given in the curative instruction that they were [to] disregard any testimony regarding the fact that . . . he was on the sex offender registry. The statement . . . does not make direct reference to the sex offender registry.

We agree with the trial court that the prosecutor's statement does not make direct reference to the Defendant's status as a registered sex offender. However, the statement clearly infers that the Defendant's guilt was reinforced by how the victim identified the Defendant, i.e., the fact that the victim found the Defendant's picture on a sex offender website makes it more likely that he is the perpetrator of the sexual offense. Viewed in this light, the comment could divert the jury from its duty to decide the case based on the evidence presented. See Goltz, 111 S.W.3d at 6 ("The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict."). The trial court did not take any curative steps during closing argument in the absence of a contemporaneous objection by Defendant to the comment. However, the trial court's curative instruction following the offending trial testimony told the jury not to decide the case based upon the Defendant's past conduct.[3]

The statement's context the State asserts this court to adopt on appeal—that the victim was confident in her identification of the Defendant—is unconvincing. Nonetheless, we cannot conclude that the prosecutor's statement was so inflammatory

---

[3] The instruction did not tell the jury to completely disregard the victim's testimony, as the trial court indicated at the motion for new trial hearing.

that the jury was encouraged to convict the Defendant at all costs. See Goltz, 111 S.W.3d at 6 ("The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury."). Moreover, as noted above, the State's case was relatively strong against the Defendant as it included the Defendant's confession. We conclude that there is nothing in the record which would support a finding that the argument proffered by the State was "so exceptionally flagrant that [it] constitute[s] plain error and provide[s] ground[] for reversal even if [it was] not objected to." See Banks, 271 S.W.3d at 132, n.30 (citing Reid, 91 S.W.3d at 283-84, and noting that "[u]nobjected to closing arguments warrant reversal only in exceptional circumstances. Accordingly, like the United States Court of Appeals for the Eighth Circuit, '[w]e bear in mind that fleeting comments that passed without objection during the rough-and-tumble of closing argument in the trial court should not be unduly magnified when the printed transcript is subjected to painstaking review in the reflective quiet of an appellate judge's chambers.[']") (internal citations omitted). The Defendant has not shown that the State's argument prejudiced him nor has he presented any "exceptional circumstances" warranting plain error relief.

CONCLUSION

Based upon the foregoing, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE